(No. 5451

SELWYN ZUN, Administrator of the Estate of JAMES CORRIGAN, JR., Deceased, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed August 4, 1972.*

MULLIN, ZUN AND DEVINE, Attorneys for Claimant.

WILLIAM J. SCOTT, Attorney General; SAUL R. WEXLER, ZEAMORE ADER, and ETTA COLE, Assistant Attorneys General, for Respondent.

PERLIN, C.J.

Claimant seeks recovery of $25,000 as Administrator of the Estate of James Corrigan, Jr., deceased, who committed

suicide by jumping from an elevated train platform in front of a passing train while in the company of two attendants from the Illinois State Psychiatric Hospital.

The evidence reveals that on November 17, 1965, James Corrigan, Jr., was admitted to the Illinois State Psychiatric Hospital upon order of the Circuit Court of Cook County, Illinois. At the time of admission, his condition was diagnosed as "schizophrenic reaction, acute undifferentiated type."

The respondent's hospital records pertaining to Corrigan were introduced into evidence by stipulation. The following is adduced from the hospital records:

The patient was in the hospital for sixty-three days and was cooperative with the staff. His father was an alcoholic who died in jail and his mother committed suicide in 1961 by jumping from a 15-story window while the patient was visiting her. Since his mother's death, the patient began to drink heavily. He married in 1963 and had one child and at the time of hospitalization his wife was four months pregnant.

On December 30, 1965, the records show that the patient was permitted to work away from the hospital on a part-time basis. On January 6, 1966, the patient's wife called the Supervisor of Psychiatric Social Work at the hospital and expressed concern because of the patient's very overt depression. For the first time he openly expressed suicidal thoughts because of his fear that he would spend "the rest of my life in mental hospitals" and also, for the first time spoke of "getting a gun and doing away with the family."

Entries in the hospital records indicate that the patient was severely depressed on January 9, 1966. Suicidal precautions were entered as physician orders on January 11, 1966, and were removed on January 17, 1966. The discharge summary states:

"After one week his depression seemed to have completely lifted. Plans were made that he would go back to work on a part time basis in the near future. Part of this plan was to provide him with enough structure that he would be able to function. Two days later and before the plan was put into effect, the patient went on a field trip with other patients and staff members. While they were waiting on the platform at the elevated train station, the patient leaped in front of the train when it pulled into the station and he was instantly killed."

Claimant contends that the Illinois State Psychiatric Hospital failed to exercise reasonable watchfulness of the decedent and that a man whose expressed suicidal thoughts caused suicidal precautions to be imposed should not be allowed on an elevated platform within two days of the lifting of these suicidal precautions.

Dr. Marvin Ziporyn, a practicing psychiatrist called as a witness for the claimant, testified in answer to a hypothetical question, that the termination of the suicidal precautions were premature and should have been continued for another ten days to two weeks to allow the staff to observe whether the transition away from suicidal tendencies had in fact occurred. On cross examination he testified that this was a question of clinical judgment as opposed to negligence in treating a patient and that returning such a patient to a normal environment within a reasonable time is conducive to good mental therapy.

Dr. Jewett Goldsmith, a psychiatrist called as a witness for respondent, testified that he is Chief of the Northwestern University Family Service at the Illinois State Psychiatric Institute; that he is in charge of thirty-five to forty patients there; that James Corrigan was one of his patients and was assigned to and treated by a resident doctor, Dr. Ingeborg Fasse, who consulted with Dr. Goldsmith. Dr. Goldsmith

said that the patient had been given a work pass on December 30, 1965, which was rescinded on January 11, 1966, after Corrigan had expressed suicidal anxiety precautions on January 10, 1966. Suicidal precautions mean that a patient cannot leave a ward without supervision and must be checked every fifteen minutes. Dr. Goldsmith stated that there is no particular timetable when suicidal precautions should be lifted and in Corrigan's case they were lifted on January 17, based "on a number of days worth of reports from the nursing personnel that he no longer appeared depressed, that he was talking more hopefully and on the basis of Dr. Fasse's observations and interview, on the basis of his discussing future plans with a certain amount of insight into his problems; and with constructive ideas about how he would go about conducting his life in the future and conducting his work and so forth in the face of total absence of any indication that suicidal thinking was still going on."

Dr. Goldsmith further testified that the patient had made no overt suicidal attempts at the institution nor were they aware of any history of making suicidal attempts. The field trip was a therapeutic procedure in Dr. Goldsmith's opinion and was considered in the patient's best interest as part of his over-all treatment plan. Once the patient was "seen as being no longer suicidal and his depression was lifted . . . a rapid return to work pass was seen as being in the offing."

Dr. Goldsmith disagreed with Dr. Ziporn on a time factor in lifting suicidal precautions and stated that even after observing a patient for two weeks, "he still might, on the first ground pass, commit suicide."

In order to recover, by a preponderance of the evidence, claimant must prove that respondent was negligent in its duty towards the decedent and that such negligence was the proximate cause of decedent's death.

Respondent contends that it exercised reasonable care in the diagnosis, treatment, and management of the decedent; that it used reasonable care in prescribing a plan for rehabilitation of the patient which included the field trip; that the decisions of respondent's physicians were made on medical judgments in the exercise of reasonable care; and that permitting the decedent to take the field trip was not the proximate cause of his death.

In the case of *Hanvey* vs. *State of Illinois*, 22 C.C.R. 513, Patricia Hanvey was a patient at the Kankakee State Hospital and had a history of suicide attempts and was classified "schizophrenic reaction, acute undifferentiated type," as in the instant case. Shortly after she was allowed ground privileges, she committed suicide by drowning herself in the Kankakee River which bordered the hospital.

In denying recovery, the Court conceded that the standard of care is identical in private and public institutions, but held that the State is not an insurer as follows:

"The only way that the state could protect all mental patients, regardless of the progress of improvement they had shown, would be not to grant any ground privileges, or any privileges whatsoever . . . not to permit any patient of this kind, or any other type privileges, because there is always a possibility that any mental patient might find some means to destroy himself; and, to keep all patients under constant surveillance. This, in our opinion, would certainly be a detrimental factor, and would impede recovery, as it is unquestionably a part of the therapy treatment as mental patients show signs of improvement and self-reliance to grant them privileges preparatory to restoring them to a natural and normal existence. . . . " (at p. 519)

In the case of *Hebel* vs. *Hinsdale Sanitarium and Hospital*, 2 Ill. App. 2d 527, a mental patient was given shock treatment, but not provided sufficient security. She left the hospital and was killed by a railroad train. In denying her husband recovery against the hospital, the Court stated:

"If the negligence does nothing more than furnish a condition by which the injury is made possible and that condition causes an injury by the subsequent independent act of a third person, the creation of the condition is not the proximate cause of the injury."

In the opinion of the Court, the claimant has failed in its burden of proof. There is no showing that respondent failed to exercise reasonable care nor that the tragedy was the natural and probable consequence of their care or lack of care.

Recovery is therefore denied.